**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| AIR TROPIQUES, SPRL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-1438 |
| | § | |
| NORTHERN & WESTERN INS. | § | |
| CO. LTD., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This first-party insurance coverage dispute is between Air Tropiques, Sprl, an air carrier based in Africa, and its insurer, Northern & Western Insurance Co., Ltd ("NWIC"). NWIC denied Air Tropiques's claim for coverage after its NWIC-insured airplane crashed in the Republic of Congo. Air Tropiques has sued the following defendants: 1). NWIC, an insurance company registered and headquartered in the Federation of St. Kitts and Nevis, with an "administrative" office in Stafford, Texas; 2). NWIC Management Corp., now known as Supra Management Solutions, Inc.,[1] NWIC's "managing agent," a Texas corporation with its only office in Stafford, Texas; and 3). Devon and Robert Harrison, the owners and operators and, respectively, president of NWIC and senior-vice president of NWIC Management.

The pending motions include NWIC's motion to dismiss the complaint for lack of personal jurisdiction and for improper venue under Federal Rules of Civil Procedure

---

[1] The court refers to Supra Management Solutions by its name during most of the relevant period, NWIC Management Corp.

12(b)(2) and 12(b)(3), (Docket Entry No. 6); NWIC Management's motion to dismiss for failure to state a claim under Rule 12(b)(6), (Docket Entry No. 7); and Robert and Devon Harrison's motion to dismiss for failure to state a claim under Federal Rule 12(b)(6), (Docket Entry No. 8).   This Memorandum and Opinion addresses only NWIC's jurisdiction and venue motion.   The motions to dismiss based on Rule 12(b)(6) are addressed in a separate Memorandum and Opinion.

While the parties vigorously argued the personal-jurisdiction issue, the case law has evolved since the parties filed their briefs.   NWIC emphasizes that it is a St. Kitts insurer, the insured is based in Africa, and that the disputed loss occurred in Africa.   Air Tropiques responds that, although the policy was issued by a St. Kitts insurance company and the loss occurred in Africa, the underwriting, and the claims adjustment, and the decision to deny the claim, all took place in Texas.

Based on the pleadings, the motions and responses, the record, and the applicable law, this court concludes that Air Tropiques has not made a *prima facie* showing of general or specific personal jurisdiction over NWIC.   Its motion to dismiss based on lack of personal jurisdiction is therefore granted.   The motion to dismiss for improper venue is denied as moot.

The reasons for these rulings are explained in detail below.

## I.    Background

In ruling on a motion to dismiss for lack of personal jurisdiction, "the district court may consider the contents of the record before the court at the time of the motion, including affidavits, interrogatories, depositions, oral testimony, or any combination of

the recognized methods of discovery." *See Quick Techs., Inc. v. Sage Grp. PLC,* 313 F.3d 338, 344 (5th Cir. 2002) (internal quotation marks omitted).  At this preliminary stage, "the court must accept as true all uncontroverted allegations in the complaint and resolve any factual disputes in favor of the plaintiff." *ITL Int'l Inc. v. Constenla, S.A.,* 669 F.3d 493, 496 (5th Cir. 2012).  But the court is not obligated to credit conclusory allegations, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power Co.,* 253 F.3d 865, 868–69 (5th Cir. 2001).[2]

Air Tropiques, Sprl, a company organized under the laws of the Democratic Republic of Congo (the "DRC"), operates an airplane-charter service in the DRC. (Compl. ¶ 15).  Air Tropiques insured the aircraft at issue with NWIC.  Texas residents Robert and Devon Harrison formed NWIC "under the laws of the Federation of St. Kitts & Nevis ("St. Kitts")," where it is headquartered.  NWIC maintains an "administrative office" in Stafford, Texas.  (*Id.* ¶ 4; Docket Entry Nos. 11-3, 11-10).  Devon Harrison is the president of NWIC.

---

[2]  The following background comes from the complaint allegations and the facts established in the record submitted in connection with the motion to dismiss and the responses.  That record includes the following:  the complaint, (Docket Entry No. 1), and the policy and terms and conditions attached to the complaint, (Docket Entry Nos. 1-1, 1-2, 1-3); the motion to dismiss, (Docket Entry No. 6), and the documents attached to that motion including emails relating to the underwriting process, Air Tropiques's insurance application, policy, and related documentation, and emails and letters from the claim administration, (Docket Entry Nos. 6-1–6-7); Air Tropiques's response and the documents attached to the response, including records relating to Supra's business registration, (Docket Entry No. 11-2), internet printouts reflecting NWIC's Stafford, Texas address, (Docket Entry No. 11-3), the affidavit of Henry Emile Braun, Air Tropiques's insurance broker and the exhibits attached to that affidavit, (Docket Entry No. 11-4–11-7), and various complaints unrelated to this dispute that NWIC filed in Texas, (Docket Entry No. 11-9–11-10); the reply (Docket Entry No. 16); the supplemental reply, (Docket Entry No 20), and the attached exhibits; the surreply and the attached exhibits, (Docket Entry Nos. 21–24); and the response to the surreply (Docket Entry No. 25).

Henry Emile Braun owned and managed Braun Underwriting, an insurance brokerage firm in the DRC. (Docket Entry No. 11-4 at 1). Braun brokered the policy between Air Tropiques and NWIC for the 2010-2011 policy year. (*Id.* at 2). NWIC made clear to Braun that all underwriting and claims handling would be handled by NWIC Management Corp. (*Id.* at 2). NWIC Management Corp. is a Texas corporation with its only office in Stafford, Texas. The address is the same as the NWIC "administrative" office address.

The policy covered Air Tropiques's 1972 Beech Kingair 100 (Reg. No. 9Q-CEM) (the "airplane"). The policy stated that the airplane had an Agreed Value of $1,100,000. Devon N. Harrison signed the policy on NWIC's behalf, as NWIC's president. The insurance contract coverage page stated:

> Insured by Northern & Western Insurance Company, Ltd.
> Bldg. #2, Nelson Springs Shopping Complex
> Nelson Springs, Nevis
> Telephone: +1 **281** 565 5599

(Docket Entry No. 11-5 (emphasis added)). When the policy was renewed in 2011, Braun worked with an underwriter. The underwriter's telephone number is the same as that listed on the coverage page. The telephone number is a Houston, Texas area code. Braun stated in his affidavit that he was "led to understand that the aviation coverage was being underwritten by NWIC personnel at its offices in the Houston, Texas area." (Docket Entry No. 11-4 at 2).

In an affidavit attached to NWIC's supplemental reply, Robert Harrison asserted that the decision to enter into the policy originated with another company unrelated to the

defendants.  Specifically, Robert Harrison stated that Braun "regularly met with NWIC's St. Kitts based managing general agent Aviation Asset Managers, Ltd. in the UK and NWIC was present at a number of those meetings."  (Docket Entry No. 20-3).  "The policy produced by NWIC was generated as a result of Mr. Braun's contact with Aviation Asset Managers while in the UK.  The policy contract was generated from forms produced and maintained by NWIC's Nevis office.  After being issued and electronically signed by [Devon] Harrison, the policy was forwarded, via email, to Henry Braun in the D[RC]."  (*Id.*).  The negotiations leading up to the decision to enter into the policy appear to have occurred in the United Kingdom through Aviation Asset Managers.  Air Tropiques does not appear to dispute this fact.  Air Tropiques does not explain Aviation Asset Manager's role in this dispute.

On December 4, 2011, the airplane crashed while attempting to land at the Pointe Noire Airport in the Republic of Congo.  (Docket Entry No. 1 ¶ 15).  A pilot and six others were on board, including two children.  (Docket Entry No. 11-7 at 4).  The pilot and two others were injured.  (*Id.*)  Air Tropiques timely notified NWIC of the loss.  On December 5, 2011, Braun emailed Robert Harrison, stating:

> I'm sorry to have to advise you of a loss for one of the planes covered for this company.  It is the Beechcraft 9Q-CEM who had a crash yesterday in Pointe Noire – Congo.  There is only material damage and no death involved.  It seems that the plane had landed safely and there has been a problem at the end of the runway.  The weather was apparently very bad. Please advise the steps you want us to take.

(Docket Entry No. 6-3).

5

Braun handled the claims process for Air Tropiques.  Marie Benham handled the claim adjustment for NWIC.  Braun reached Benham at a Houston-area telephone number.

On December 29, 2011, NWIC sent Air Tropiques an acknowledgement letter on NWIC letterhead.  The letterhead included NWIC's administrative office in Stafford, Texas as NWIC's United States address and the office address in Nevis as its "registered office."  (Docket Entry No. 11-7 at 2).  This letter stated that NWIC "wish[ed] to acknowledge the receipt of the details of subject hard landing occurrence on the 4th of December 2011.  We are working with a third party loss adjuster at this time to complete our review of this occurrence."  *Id.*  Benham signed the letter "for and on behalf of" NWIC and listed a Houston number as her telephone contact.

On February 22, 2012, on NWIC letterhead listing only NWIC's Nevis address, Benham sent Air Tropiques a letter describing the claim-adjustment findings.  The letter stated:

> Having undertaken a comprehensive valuation review, market sources approached have provided us with an average hull value for this particular aircraft of $480,500 USD, and an adjusted engine and aftermarket equipment value of $90,000 USD . . . .  As such, the total average market adjusted value for this aircraft is $570,500 USD.

(*Id.* at 6).  Benham signed "for and on behalf of" NWIC and provided her Houston telephone number.

The next day, February 23, 2012, Benham sent a follow-up letter on the NWIC letterhead that listed only its registered Nevis address.  This letter stated:

6

I failed to mention that there is an alternative option for your consideration. NWIC can offer to purchase a comparable or better [airplane] and ship it to your location.  Separately, we would issue payment in the amount of $90,000 for the adjusted engine and aftermarket equipment value.

Should you have any questions or wish to discuss this matter further, please do not hesitate to contact us.  However, if you are satisfied and in agreement with the foregoing adjustment, kindly sign and acknowledge your acceptance hereto on the following page and return it to us for processing.

(*Id.* at 9).

Air Tropiques was dissatisfied with these offers, which were for less than the $1.1 million Agreed Value under the policy.  On March 5, 2012, Benham sent the following email to Braun:

Dear Mr. Henry Braun:

Further to our receipt of your email of 24th February, 2012, in the above regard we have carefully reviewed the actual value of the aircraft at the time of the loss against the points raised in your email and can now respond as follows:

In the initial[] underwriting submission, the value of the [airplane] was questioned and unsupported confirmation was provided by you that this aircraft would indeed appraise today for US $1,100,000.00.  We have attempted to independently obtain current market valuations for not only the aircraft, but also the after-market modifications that would confirm such a high value without success and indeed found further that at that value, it would be the most expensive King Air 100 Series aircraft in the world today.  I would further point out that it is not incumbent on NWIC to prove an obviously inflated valuation.  That responsibility rests solely with the insured and to date we have received nothing from any qu[a]lified thir[d] party that would support such a value.

As such, we have requested an appraisal from Oracle Forensic Aviation Engineering, Inc. (USA) and will further consider upon receipt of their report which is expected in due course.

(*Id.* at 10–11).

7

On March 9, 2012, in an email exchange between Braun and Robert Harrison, senior vice-president of NWIC Management, Braun attempted to justify the aircraft's Agreed Value.  (*Id.* at 13–14).   On March 13, 2012, Braun wrote a letter to Robert Harrison, "Senior Underwriter," addressed to NWIC Ltd. at its United States administrative office in Stafford, Texas.   Braun attached documents relating to the airplane's value.  (*Id.* at 15).

On April 10, 2012, Robert Harrison wrote to Braun on NWIC letterhead, "for and on behalf of" NWIC.  Harrison's letter stated:

> NWIC hereby offers settlement in the amount of US $471,306.00 in line with the expert valuation findings of Oracle Aviation Forensics; or we offer to purchase a comparable or better [airplane] and ship it to your location.

(*Id.* at 17).   He signed the letter "on behalf of" NWIC and did not include a title or indicate an affiliation with NWIC Management.

On April 16, 2012, Braun wrote a letter directed to NWIC, to the attention of Benham and Robert Harrison.  That letter stated:

> The client has taken the option not to discuss the valuation issued by Oracle Aviation Forensics to avoid another waste of time and discussions, which finally will not come up with a satisfactory answer for each of the parties.  The client is going to accept your offer mention in the letter of April 10th 2012, formulated by yourself as follows[:] Or we offer to purchase a comparable or better [airplane] and ship it to your location.

(*Id.* at 19).  Braun's letter identified the specifications for an aircraft that would be an acceptable replacement for the airplane.   Apparently, though it is unclear, these specifications pushed the cost of the replacement aircraft above the adjusted value that NWIC had agreed to provide.

It is clear that NWIC did not replace the plane.  Braun's affidavit described his

communications and meeting with NWIC, NWIC Management, and the Harrisons:

> Following significant delays, and when no replacement aircraft or other reasonable
> settlement was forthcoming, [Braun] traveled to NWIC's office in the Houston
> area in April 2012.  The meeting was organized to discuss the claim and a number
> of other business issues.  [He] met with Devon Harrison, President of NWIC . . .
> Devon Harrison advised me that she could not address the resolution of the claim;
> rather, Robert Harrison, Senior Vice President of NWIC Management Corp., was
> not there, he was the decision maker on the claim and he would be making any
> final decision on the claim the following week.

(Docket Entry No. 11-4).

Braun's account of the Houston meeting is controverted.  Robert Harrison's

affidavit attached to the supplemental reply stated:

> As to Henry Braun's visit to Texas discussed in briefing and the hearing,
> the visit was not planned, although an earlier meeting was planned, and did
> not occur.  I did not attend the meeting as I was in the UK at that time.  Mr.
> Braun sought to discuss accounting issues related to Aviation Asset
> Managers termination as NWIC's managing general agent and not matters
> related to the instant controversy.  I understand that the subject meeting was
> limited to resolving accounting issues, except that Henry Braun mentioned
> Air Tropiques as a nonsubstantive aside.  This was not in any way a
> planned meeting to discuss Air Tropiques in particular.
> .

(Docket Entry No. 20-3 at 3).

In its surreply, Air Tropiques continues to contest that characterization of the

meeting. Braun submitted a second affidavit stating that he "specifically wanted to

discuss the resolution of Air Tropiques's pending claim with the purported owner and

president of NWIC, Devon Harrison, during the visit. . . . . [N]o one told me that Rob

Harrison was the 'decision maker' or that Rob Harrison would not be there before I

arrived at NWIC's offices in the Houston area. . . .  Devon Harrison advised me after I

arrived for the planned visit . . . that she could not address the resolution of the claim;

rather, she deferred to Robert Harrison (her husband and Senior Vice President) of NWIC

Management Corp., who was purportedly the 'decision maker,' but was not there."

(Docket Entry No. 22-1).

On May 30, 2012, Robert Harrison sent an email to Braun stating that the $1.1

million – the Agreed Value in the policy – was based on a "total and blatant

misrepresentation of th[e airplane's] replacement value and served to induce NWIC to

agree to a value far in excess of that aircraft's actual replacement cost at that time."

(Docket Entry No. 11-7 at 27).  Harrison continued:

> NWIC has not acted harshly against this insured even given his prior
> knowledge of the aircraft's true value but has endeavored to treat the
> insured fairly by seeking impartial third party valuations of the aircraft
> from reputable aviation experts and offering a variety of settlement options
> based on the value provided them. . . .  As such, please be advised that if
> insured chooses to file a law suit against NWIC based on his
> misrepresentation of the aircraft's replacement value that NWIC *will
> withdraw* its settlement offer and issue a denial of this claim based on the
> insured's prior misrepresentation of value being used as a fraudulent
> inducement to gain coverage[.]

(*Id.*).  The parties' briefs treat this email as NWIC's withdrawal of the settlement offer.

Robert Harrison signed the email as the senior vice-president of NWIC Management

Corp.

In response, on August 29, 2012, Air Tropiques notified NWIC's St. Kitts office

that it rejected the lower value of the airplane and wanted to pursue recovery of the

Agreed Value.  (Docket Entry No. 20-8).  Air Tropiques invoked the arbitration clause

included in the standard terms and conditions it claimed to have received as a policy

attachment.  The clause called for binding arbitration in London of all disputes arising under the policy.  A choice-of-law provision in the same terms and conditions specified that English law would apply.  In some of the procedural wrangling that has characterized this litigation, NWIC initially resisted arbitration, claiming that the standard-terms-and-conditions attachment Air Tropiques identified was not the proper attachment to the policy, but then reversed its position and agreed to arbitrate.  Air Tropiques, which initially sought arbitration, then asserted that NWIC had waived its right to compel arbitration in London.  Neither party has moved to compel arbitration.

On September 12, 2012, on NWIC letterhead listing only its registered Nevis address, Robert Harrison, signing on NWIC's behalf as the senior vice-president of NWIC Management Corp., stated:

> Please be advised that NWIC does hereby deny coverage for the referenced occurrence as a result of your active misrepresentation of the subject aircraft's value which served to induce NWIC to agree to an insured value far in excess of that aircraft's actual replacement cost at that time.  False or fraudulent misrepresentations of fact used to induce an insurer to provide coverage in reliance upon those misrepresentations serve to void any coverage there under from inception.
>
> Any and all prior settlement offers on the above referenced claim are hereby withdrawn retroactively from the date of first report.

(*Id.* at 28).

About a month later, in October 2012, through London counsel, NWIC notified Air Tropiques that NWIC did not believe that English law or the arbitration clause applied.  (Docket Entry No. 20-9).  (As noted, NWIC subsequently changed its position and the parties now appear to agree that English law applies, although Air Tropiques now

asserts that NWIC has waived the right to compel arbitration.)  On May 5, 2013, Air Tropiques filed this Texas suit against NWIC, NWIC Management, and Robert and Devon Harrison.  The complaint asserted claims for breach of the settlement agreement, breach of the insurance contract, violations of the Texas prompt payment statute, violations of the Texas Insurance Code, common-law bad faith, common-law fraud and misrepresentation regarding the policy, and common-law fraud and misrepresentation as to the value of the crashed airplane.  The complaint alleged that  all of the challenged actions were taken by NWIC by and through its managing agent, NWIC Management, and by and through Robert and Devon Harrison.  The complaint alleged that all of the underwriting and claim adjustment took place through NWIC Management and Robert and Devon Harrison, and asserted that NWIC had previously sued other parties in Texas.

The complaint generally alleged that all of the defendants "have been involved in the business of insurance in the State of Texas," including the following acts:

a.   making and issuing insurance contracts with Air Tropiques from Texas;

b.   taking or receiving insurance applications, including Air Tropiques's application for insurance, in Texas;

c.   underwriting coverage, including for Air Tropiques's insurance application, in Texas;

d.   receiving or collecting premiums or other consideration for insurance, including premiums or other consideration paid by Air Tropiques, in Texas;

e.   handling claims, including Air Tropiques's claim, from Texas; and

f.   maintaining an agent and/or office in Texas for these purposes.

(*Id.*).  The complaint alleged that "Defendants are doing business in and from Texas and otherwise have sufficient minimum contacts with Texas to allow the Court to exercise both specific and general personal jurisdiction over the Defendants in this action," (*Id.* ¶ 6), and concludes that general and specific jurisdiction can be exercised because "NWIC Management Corp. is the alter ego of NWIC Ltd (a Texas corporation) and/or Robert Harrison and/or Devon Harrison (Texas residents)."  (*Id.*).

## II.    NWIC's Motion to Dismiss for Lack of Personal Jurisdiction

### A.    The Legal Standard for Personal Jurisdiction

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the "plaintiff bears the burden of establishing a district court's jurisdiction over a non-resident, but it need only make a prima facie case" if the district court does not conduct an evidentiary hearing.  *Johnston v. Multidata Sys. Int'l Corp.,* 523 F.3d 602, 609 (5th Cir. 2008) (citing *Wilson v. Belin,* 20 F.3d 644, 648 (5th Cir. 1994)).   In deciding whether personal jurisdiction exists, "the district court may receive 'any combination of the recognized methods of discovery,' including affidavits, interrogatories, and depositions to assist it in the jurisdictional analysis."  *Little v. SKF Sverige AB,* No. H–13–cv–1760, 2014 WL 710941, at *3 (S.D.Tex. Feb.24, 2014) (quoting *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235, 241 (5th Cir. 2008)).

"Proof by a preponderance of the evidence is not required." *Johnston,* 523 F.3d at 609 (citing *Bullion v. Gillespie,* 895 F.2d 213, 217 (5th Cir. 1990)).  "'[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits

must be resolved in the plaintiff's favor for purposes of determining whether a *prima facie* case for personal jurisdiction exists.'" *Id.* (quoting *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542, 546 (5th Cir.1985)). "When the factual differences are found in favor of [a plaintiff] at this motion phase in the litigation . . . [it] has presented a *prima facie* case for personal jurisdiction." *Id.* In short, the "court resolves all conflicts in the evidence in favor of the plaintiff and accepts as true all of the plaintiff's uncontroverted allegations." *Little,* 2014 WL 710941, at *3 (citing *Johnston,* 523 F.3d at 609).

"A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant (1) as allowed under the state's long-arm statute; and (2) to the extent permitted by the Due Process Clause of the Fourteenth Amendment." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009). "The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore,* , – U.S. –, –, 134 S.Ct. 1115, 1121 (2013) (citing *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 291 (1980)). "'Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis.'" *Mullins,* 564 F.3d at 386 (quoting *Johnston*, 523 F.3d at 609). "To satisfy the requirements of due process, the plaintiff must demonstrate '(1) that the non-resident purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the state; and (2) that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Johnston*, 523 F.3d at 609).

As a general principal, a "defendant establishes minimum contacts with a state if 'the defendant's conduct and connection with the forum state are such that [he] should reasonably anticipate being haled into court there.'" *Nuovo Pignone, SpA v. Storman Asia M/V,* 310 F.3d 374, 379 (5th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).  "There must be some act whereby the defendant 'purposely avails [himself] of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Burger King,* 471 U.S. at 379).  "A nonresident 'may permissibly structure his primary conduct so as to avoid being haled into court in a particular state.'"  *Id.* (quoting *World–Wide,* 444 U.S. at 297).  Two types of minimum contacts exist: those that create general personal jurisdiction and those that create specific personal jurisdiction. *Johnston,* 523 F.3d at 609 (quoting *Lewis v. Fresne,* 252 F.3d 352, 358 (5th Cir. 2001)). The Supreme Court recently rearticulated the standards for both general and specific jurisdiction.  *See Daimler AG v. Bauman*, – U.S. –, –, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014) (general jurisdiction); *Walden v. Fiore*, – U.S.–, –, 134 S.Ct. 1115, 1121 (2014) (specific jurisdiction).

### B.    General Personal Jurisdiction

The Supreme Court has held that a court may exercise general jurisdiction over a nonresident defendant "to hear any and all claims" against him when his contacts with the state are so "'continuous and systematic' as to render [him] essentially at home in the forum." *Goodyear Dunlop Tires Operations v. Brown,* – U.S. –, –, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011).  The continuous-and-systematic-contacts test is difficult to meet

and requires extensive contacts between a defendant and the forum state. *Johnston,* 523 F.3d at 609 (quoting *Submersible Sys., Inc. v. Perforadora Cent., S.A.,* 249 F.3d 413, 419 (5th Cir. 2001)).  But even more recently, the Supreme Court has stepped away from the continuous-and-systematic-contacts test in favor of an even more stringent test.

In *Daimler*, the Court noted that the terms "'continuous and systematic' were used in *International Shoe* to describe instances in which the exercise of *specific* jurisdiction would be appropriate."  *Daimler*, 134 S. Ct. at 761 (citation and footnote omitted).  "Turning to all-purpose jurisdiction, in contrast, *International Shoe* speaks of 'instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit . . . *on causes of action arising from dealings entirely distinct from those activities*.'" *Id.* (emphasis original) (citing, among others, Witchell, *Why We Keep Doing Business With Doing–Business Jurisdiction*, 2001 U. CHI. LEGAL FORUM 171, 184 (*International Shoe* "is clearly not saying that dispute-blind jurisdiction exists whenever 'continuous and systematic' contacts are found.")).  "Accordingly, the inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State.'"  *Id.* (citations omitted).

"With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.' *Id*. at 760 (citations omitted).  "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable."  *Id.* (citing. *Hertz Corp. v. Friend,* 559 U.S.

77, 94, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010) ("Simple jurisdictional rules . . . promote greater predictability.")). "These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Id.*

In *Goodyear,* the Supreme Court held that a court may assert jurisdiction over a foreign corporation "to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum state."  131 S.Ct. at 2851.  The "paradigm forum for the exercise of general jurisdiction . . . [is] one in which the corporation is fairly regarded as at home." *Id.* at 2853–54.  These "paradigm forums" are the principal place of business and the place of incorporation.  *Id.*  "*Goodyear* did *not* hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums."  *Daimler*, 134 S.Ct. at 760 (emphasis added); *see Goodyear,* 131 S.Ct. at 2855.  Nonetheless, "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Id*.

In *Daimler,* a group of Argentine plaintiffs filed suit against Daimler, a German corporation, in the Northern District of California, alleging that Mercedes–Benz Argentina, the defendant's subsidiary corporation, collaborated with Argentine state security forces to "kidnap, detain, torture, and kill certain MB Argentina workers" during Argentina's "Dirty War" of 1976–1983.  *Daimler*, 134 S.Ct. at 751–52. The actions at issue occurred in Argentina.  *Id.*  The plaintiffs named only one defendant in the

complaint — Daimler, the German corporation — and sought to hold it vicariously liable for the subsidiary's actions.  *Id.* at 752.  The question addressed was "whether the Due Process Clause of the Fourteenth Amendment precludes the District Court from exercising jurisdiction over Daimler [a German corporation] in this case, given the absence of any California connection to the atrocities, perpetrators, or victims described in the complaint."  *Id.* at 751.

The *Daimler* plaintiffs argued that jurisdiction in California was proper because Mercedes–Benz USA, a Delaware corporation with its principal place of business in New Jersey and an indirect subsidiary of defendant Daimler, maintained multiple California-based facilities and realized substantial revenues from California sales.  *Id.* at 753.  For the purposes of that decision only, the Court assumed that Mercedes–Benz USA was "at home" in California.  *Id.* at 758.  The Court ultimately held that, even assuming that Mercedes–Benz USA was "at home" in California and that its actions could be imputed to Daimler, "there would still be no basis to subject Daimler to general jurisdiction in California, for Daimler's slim contacts with the State hardly render it at home there."  *Id.* at 760.  The Court rejected the plaintiffs' request to "approve the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business'" as "unacceptably grasping." *Id.* at 761.

What is clear from *Daimler* is that, for a court to exercise general jurisdiction over a foreign corporation, that corporation itself — not its managing agent or subsidiary or affiliate — must be "at home" in the forum state.  *See id.* "At home" can be read to mean "instances in which the continuous corporate operations within a state [are] so substantial

and of such a nature as to justify suit . . . *on causes of action arising from dealings entirely distinct from those activities.*"  *Id.* at 761 (*quoting Int'l Shoe Co.*, 325 U.S. at 318). While the Court did not expand on the specifics, it noted that it would be *possible* for a corporation to be "at home" in places outside its place of incorporation or principal place of business. *See id.* at 761 n. 19.

On the present record, it is at best unclear whether NWIC is "at home" in Texas. It is undisputed that NWIC is incorporated in St. Kitts.  St. Kitts also appears to be the location of NWIC's principal place of business.  Air Tropiques does not assert that the Texas "administrative" office is NWIC's principal place of business for general personal-jurisdiction purposes.

Air Tropiques's complaint and briefs focus on the dispute-related contacts, with no analysis or factual assertions on which the court can find "dispute-blind" jurisdiction. The complaint and brief generally asserts that NWIC Management and the Harrisons were NWIC's agent in Texas and NWIC's alter egos.  The activities alleged to have taken place in Texas relating to this dispute do not provide a *prima facie* basis for finding general all-purpose jurisdiction over NWIC.

Before *Daimler,* NWIC might have been subject to general jurisdiction in this forum. *See Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino,* 447 F.3d 1357 (11th Cir. 2006), 1362–63; *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1268–69 (11th Cir. 2002). In *Stubbs,* the plaintiff, a Mississippi resident was injured in the swimming pool at the Nassau Resort, a Nassau, Bahamas company located in the Bahamas. *Stubbs,* 447 F.3d at 1359. The plaintiffs submitted evidence that the

codefendant, Crystal Palace "acted as an advertising and booking department for Nassau Resort." *Id.* at 1362.  The court found that Crystal Palace was an agent of Nassau Resort, "and its activities may be used as the basis to assert general jurisdiction over Nassau Resort." *Id.* The court found that "[a]lthough Nassau Resort is a Bahamian corporation, it has been utilizing a corporate office in Ft. Lauderdale to market vacations for Nassau Resort," and that it conducted significant business in Florida.  *Id.* at 1364.  General jurisdiction was appropriate based on these contacts and based "on Florida's interest in overseeing marketing of safe enterprises and businesses conducting significant activities in the state, and in adjudicating disputes arising from injuries which occur at or as a result of resorts marketing in Florida." *Id.*

Here, based on the background detailed above, Air Tropiques has shown that NWIC Management participated in underwriting the insurance policy that covered property located in Africa, for an insured based in Africa, by an insurer in St. Kitts.  Air Tropiques has also shown that NWIC Management participated in the claim adjustment that led to NWIC's decision to deny the claim.  NWIC has represented, and Air Tropiques has not disputed, that NWIC does not provide any insurance coverage in Texas or seek business from Texas.  The only facts alleged or documented about NWIC are that individuals acting on its behalf sent letters or emails from its "administrative" Texas office during the underwriting and claims adjustment process.  The evidence does not show that NWIC was "at home" in Texas.

The allegations in the complaint and the facts developed in evidence do not, at this stage, warrant finding general jurisdiction over NWIC through NWIC Management.  In

*Daimler* the plaintiffs asserted, and the Ninth Circuit found, general jurisdiction based on an agency theory. "The Ninth Circuit's agency theory [appeared] to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the sprawling view of general jurisdiction" that the Supreme Court rejected in *Goodyear*. *Daimler*, 134 S.Ct. 759–60. NWIC Management is "at home" in Texas, but its Texas contacts cannot create general jurisdiction over NWIC.

### C.    Specific Personal Jurisdiction

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*, 131 S.Ct.at 2851 (quotation omitted). The question is "whether there was 'some act by which the defendant purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* at 2854 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

A unanimous Supreme Court recently rearticulated the framework for analyzing specific personal jurisdiction. *Walden,* 134 S.Ct. at 1121. Specific-jurisdiction questions "'focus[ ] on the relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). "For a State to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State." *Id.* (emphasis added).

A court considers two issues in deciding whether a defendant's suit-related conduct creates a sufficient relationship with the forum state. *See id.* at 1122. "First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* (quoting *Burger King,* 471 U.S. at 475). The due-process limits on a state's "adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of the plaintiff[ ] or third parties" *Id.* (citation omitted). The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* (citations omitted). The "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). "Put simply, however significant the *plaintiff*'s contacts with the forum may be, those contacts cannot be decisive in determining whether the *defendant*'s due process rights are violated.'" *Walden,* 134 S.Ct. at 1122 (quotation omitted) (emphasis added).

"Second, [the] 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* (citations omitted). The Supreme Court has, for example, "upheld the assertion of jurisdiction over defendants who have purposefully reach[ed] out beyond their State and into another by . . . entering a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State." *Id.* (citations omitted). "But the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's

conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* Though "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties[,] a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123 (citations omitted). "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." *Id.* (quotation omitted).

Air Tropiques has not made a *prima facie* showing of specific personal jurisdiction over NWIC because it has failed to show that NWIC purposely availed itself of the Texas forum when it entered into the insurance contract or settlement agreement with Air Tropiques.  "[I]n a breach of contract case, to determine whether a party purposefully availed himself of a forum, a court must evaluate 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . .'"  *Maxxim Med., Inc. v. Michelson*, 182 F.3d 915 (5th Cir. 1999) (unpublished) (quoting *Burger King*, 471 U.S. at 479).  This accords with the Supreme Court's "emphas[is on the] . . . need for a 'highly realistic approach' that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'"  *Burger King*, 471 U.S. at 479 (citation omitted).

The breach of contract claim arises from an insurance contract governed by English law between NWIC – a St. Kitt's insurance company – and Air Tropiques – a

DRC company – insuring property located, operated, and damaged in Africa.   Air Tropiques used a DRC insurance brokerage firm to negotiate the policy and handle the claim.   The record is unclear as to who negotiated the policy on NWIC's behalf, though NWIC's president, Devon Harrison, electronically signed the contract in Houston and emailed it to the UK for finalization.   Air Tropiques has not presented evidence that NWIC's Houston activities in Texas create specific personal jurisdiction over it in Texas. NWIC did not negotiate the insurance contract in Texas; the contract did not have foreseeable Texas consequences; the contract is governed by English law; and the parties to the contract are foreign entities.   NWIC did not direct its activities toward Texas, did not contract with Texas residents, and did not avail itself of Texas law in the formation of the insurance contract.   The fact that documents were sent to and from Texas and the insurance contract was signed (subject to finalization in the UK), by NWIC's president, who was in Texas, does not support specific personal jurisdiction over NWIC in Texas. *See Religious Technology Ctr. v. Liebreich*, 339 F.3d 369, 375 (5th Cir. 2003).

Nor is there a basis to conclude that the settlement agreement between NWIC and Air Tropiques was negotiated in, agreed to, or breached in Texas.   The settlement agreement was between foreign parties without any foreseeable consequences in Texas. The settlement agreement is related to the insurance policy governed by English law, and Air Tropiques has not shown that Texas law would apply.[3]

---

[3]   In intentional tort cases, the Fifth Circuit has applied the "purposeful direction" or "effects" test from *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).   *See Guidry v. U.S. Tobacco Co., Inc.* 188 F.3d 619, 628–29 (5th Cir.1999).   Air Tropiques does not assert specific personal jurisdiction under *Calder*'s substantial-effects test.

Perhaps anticipating this result, Air Tropiques's briefs and submissions focus on NWIC Management and the Harrisons.  Air Tropiques argues that NWIC Management and the Harrisons were either NWIC's agents or its alter egos for the purpose of establishing specific personal jurisdiction over NWIC for the breach of contract claims, the fraud claims, and the conversion claim.  The only evidence that Air Tropiques identifies to support that theory of personal jurisdiction are the role of NWIC Management in underwriting the policy; the letters signed on behalf of NWIC by Benham, a NWIC Management employee, during claim administration; communications with an NWIC Management underwriter before the policy contract was finalized; and Robert Harrison's role in communicating with Air Tropiques about the claim denial,  at times in his role as senior vice-president of NWIC and at times on behalf of NWIC.  The briefs and evidence fail to show that the Harrisons' and NWIC Management's Texas contacts can be imputed to NWIC.

"As a general rule . . . the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated."  *Freundensprung v. Offshore Tech. Sers., Inc.*, 379 F.3d 327, 246 (5th Cir.2004) (citation omitted).  "This principle, however, is not inviolate.  Rather, the presumption of institutional independence of related corporate entities may be rebutted by 'clear evidence,' which requires a showing of 'something beyond' the mere existence of a corporate relationship between a resident and nonresident entity to warrant the exercise of jurisdiction over the

nonresident.  *Id.* (citing *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999).

The Fifth Circuit "generally demand[s] proof of control by [one corporation] over the internal business operations and affairs' of another corporation to make the other its agent or alter ego, and hence 'fuse the two together for jurisdictional purposes.'"  *Id.* (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5thc Cir. 1983) (collecting cases).  "In determining whether a plaintiff asserting personal jurisdiction has overcome the presumption of corporate separateness, th[e Fifth Circuit] considers the following nonexhaustive factors: (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities."  *Id.* (citing *Hargrave*, 710 F.2d at 1160).

Air Tropiques has not pleaded or shown that NWIC and NWIC Management can be fused and treated as one entity for the purpose of the jurisdictional analysis.  The evidence is unclear whether: (1) NWIC and NWIC Management are in a parent-subsidiary relationship; (2) the extent to which the two entities have different directors and officers; (3) the extent to which corporate formalities were observed; (4) the extent to which separate accounting systems were used; and (5) whether the entities maintained separate accounting systems.

The record shows that NWIC and NWIC Management maintain separate headquarters.  Air Tropiques has presented evidence that NWIC Management employees

underwrote the policy and handled the claims-adjustment process on NWIC's behalf and that NWIC Management's employee and principal signed letters on NWIC letterhead. That alone, however, does not warrant treating the two corporate entities as one under an alter-ego theory of personal jurisdiction.  Air Tropiques has not identified evidence that warrants setting aside the corporate forms and imputing one distinct corporate entity's contacts to the other.

The email correspondences between Robert Harrison and Braun are on topics relating to underwriting and the value of the loss.  (*See e.g.*, Docket Entry No. 11-7, March 13, 2012 Letter from Braun ("To the attention of Rob Harrison-Senior Underwriter")).  The letter that Robert Harrison sent on the alleged settlement offer was on NWIC letterhead and signed on behalf of NWIC.  Air Tropiques points to a letter on NWIC letterhead signed by Robert Harrison as the senior vice-president of NWIC Management Corp., advising Air Tropiques that NWIC had denied the coverage of that claim.  But this letter states that NWIC, not NWIC Management, had denied the claim. This letter does not provide the basis to find that NWIC is NWIC Management's alter ego or that NWIC Management's Texas contacts are NWIC's contacts.  Aditionally, when Air Tropiques sent the August 29, 2012 letter seek to arbitrate the claim, it was addressed to NWIC's registered Nevis address and was received by "DH," presumably Devon Harrison, NWIC's president, on September 4, 2012.  NWIC Management's activities are underwriting before the insurance policy was issued and claim administration on NWIC's behalf.  Neither present a basis to find specific personal jurisdiction in Texas over NWIC based on an alter-ego theory.

An agency theory similarly fails to show specific personal jurisdiction over NWIC.  In the complaint, Air Tropiques alleged as follows:

> 37.  **Agency**.  At all relevant times, NWIC Management Corp., Robert Harrison and /or Devon Harrison were acting as agents of NWIC Ltd. for whose acts or omissions NWIC Ltd. is vicariously liable. . . .  NWIC Ltd. and/or NWIC Management Corp. are also vicariously liable for the acts or omissions of any other agents acting on behalf of NWIC ltd., NWIC Management Corp., Robert Harrison, and/or Devon Harrison.

In its briefs, Air Tropiques argued that personal jurisdiction exists because of the presence or existence of "agents and/or alter egos" in Texas.  Some courts have treated agency theories of personal jurisdiction as separate and apart from alter-ego theories.  *See Maurice Pierce & Assocs.*, 608 F. Supp. 173, 176 (N.D. Tex. 1985) ("Two theories have been employed by the courts in determining whether the business activities of one corporate entity may be imputed to a related corporate entity for purposes of personal jurisdiction.  These theories are (1) the agency theory and (2) the control or the alter ego theory." (citations omitted)).  It is unclear whether the Fifth Circuit uses the *Hargrave* factors in analyzing those two theories of personal jurisdiction.  *See Freudensprung*, 379 F.3d at 346 (noting that "our cases generally . . . demand proof of control [by one corporation] over the internal affairs of another corporation to make the other its agent or alter ego" before stating that the *Hargrave* factors are the appropriate test to "overcome the presumption of corporate separateness.); *see also O'Quinn v. World Indus. Const.*, 68 F.3d 471 (5th Cir. 1995) (nonprecedential) ("According to well-established law, a defendant may be found subject to personal jurisdiction as a result of the actions of an agent. . . . [I]n order for a principal-agent relationship to be established, the principal

must have the right to control both the means and details of the process by which the agent accomplishes the actions at issue.").

"Under Texas law, an agency relationship must be affirmatively established[;] it may not be presumed." *Coffey v. Fort Wayne Pools, Inc.*, 24 F. Supp.2d 671, 677 (N.D. Tex. 1998) (citations omitted).   An agency relationship requires "evidence from which the court could conclude that '[t]he alleged principal [had] the right to control both the means and details of the process by which the alleged agent [was] to accomplish the task." *Id.*   The arguments and briefs Air Tropiques submitted focus exclusively on the *Hargrave* factors.   Air Tropiques does not identify or submit evidence that supports finding an agency relationship, either independent of or overlapping with the alter-ego argument.   Air Tropiques has neither argued nor shown that NWIC controlled NWIC Management.   It is Air Tropiques's burden to make a *prima facie* showing of personal jurisdiction; it has not met this burden as to NWIC.

## III.   NWIC's Motion to Dismiss for Improper Venue

NWIC moved in the alternative to dismiss for improper venue.   That motion is moot in light of the court's finding that it lacks personal jurisdiction over NWIC.

## IV.   Conclusion

NWIC's motion to dismiss for lack of personal jurisdiction is granted.   The motion to dismiss for improper is denied as moot.

29

This Memorandum and Opinion does not address arbitration and there is no motion to compel arbitration pending before the court.   A separate Memorandum and Opinion addresses the pending motions to dismiss for failure to state a claim.

SIGNED on March 31, 2014 at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge